UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

OTIS MACK, III,

     Applicant,

v.                             CASE NO. 8:15-cv-676-T-23JSS

SECRETARY, Department of Corrections,

     Respondent.

_____/

# O R D E R

Otis Mack, III, applies for the writ of habeas corpus under 28 U.S.C. § 2254 (Doc. 1) and challenges the validity of his state convictions for first-degree murder and burglary of an occupied dwelling, for which convictions Mack is imprisoned for life.  Numerous exhibits ("Respondent's Exhibit __") support the response. (Doc. 12)  The respondent admits the application's timeliness. (Doc. 12, p. 5)

## FACTS[1]

Mack and his co-defendant entered the seventy-four-year-old victim's home where they used duct tape to bind both her ankles and hands and to cover her mouth. Mack and his co-defendant took from the victim's home a computer; the victim's purse and jewelry; and some of the victim's personal papers.  Mack and the

---

[1] This factual summary derives from Mack's brief on direct appeal and testimony adduced at trial. (Respondent's Exhibits 4 and 5)

co-defendant left the scene in the victim's car.  The victim died as a result of the attack.  The medical examiner testified that the victim suffered from emphysema.  During the attack the victim sustained blunt force injuries and a broken rib.  The medical examiner opined that (1) lung disease, (2) a gag, and (3) a broken rib collectively and fatally inhibited the victim's breathing.

Mack's fingerprints were on both a roll of duct tape found in the victim's home and on a piece of duct tape from the victim's mouth.  Mack's DNA was found (1) on the victim's bed sheet, (2) on a bruise on the victim's arm, and (3) on fingernail clippings from the victim.  Mack and his co-defendant were arrested and charged with first-degree murder and burglary of an occupied dwelling.  After waiving his *Miranda* rights, Mack confessed.  A jury convicted Mack of both charges, and he serves life imprisonment.

## STANDARD OF REVIEW

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding.  *Wilcox v. Florida Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir. 1998), *cert. denied*, 531 U.S. 840 (2000).  Section 2254(d), which creates a highly deferential standard for federal court review of a state court adjudication, states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), the Supreme Court interpreted this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied — the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States" or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 693 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in

justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U. S. 86, 103 (2011). *See White v. Woodall*, 572 U. S. 415, 427 (2014) ("The critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question . . . .") (citing *Richter*); *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) ("And an 'unreasonable application of' those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice.") (citing *Woodall*, 134 S. Ct. at 1702). *Accord Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that we are to decide."). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case. "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. at 694. A federal court must afford due deference to a state court's decision. "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*,

559 U.S. 766, 779 (2010).  *See also Cullen v. Pinholster*, 563 U. S. 170, 181 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable.  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("[A] federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable.").  When the relevant state-court decision is not accompanied with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning."  *Wilson*, 138 S. Ct. at 1192. "The State may contest "the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . .  *Wilson*, 138 S. Ct. at 1192.

In a *per curiam* decision without a written opinion the state appellate court on direct appeal affirmed Mack's convictions and sentences.  (Respondent's Exhibit 7)  Similarly, in another *per curiam* decision without a written opinion the state appellate court affirmed the denial of Mack's subsequent Rule 3.850 motion to vacate.  (Respondent's Exhibit 12)  The state appellate court's *per curiam* affirmances

warrant deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir.), *reh'g and reh'g en banc denied*, 278 F.3d 1245 (2002), *cert. denied sub nom Wright v. Crosby*, 538 U.S. 906 (2003). *See also Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."), and *Bishop v. Warden*, 726 F. 3d 1243, 1255–56 (11th Cir. 2013) (describing the difference between an "opinion" or "analysis" and a "decision" or "ruling" and explaining that deference is accorded the state court's "decision" or "ruling" even absent an "opinion" or "analysis").

As *Pinholster*, 563 U.S. at 181–82, explains, review of the state court decision is limited to the record that was before the state court:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, i.e., the record before the state court.

Mack bears the burden of overcoming by clear and convincing evidence a state court's fact determination. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of

- 6 -

rebutting the presumption of correctness by clear and convincing evidence."

28 U.S.C. § 2254(e)(1). This presumption of correctness applies to a finding of fact

but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836

(11th Cir.), *cert. denied*, 534 U.S. 1046 (2001). The state court's rejection of Mack's

post-conviction claims warrants deference in this case. (Order Denying Motion for

Post-Conviction Relief, Respondent's Exhibit 9)

## INEFFECTIVE ASSISTANCE OF COUNSEL

Mack claims ineffective assistance of counsel, a difficult claim to sustain.

"[T]he cases in which habeas petitioners can properly prevail on the ground of

ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d

1506, 1511 (11th Cir. 1995) (*en banc*) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th

Cir. 1994)). *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains that

*Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of

counsel claim:

> The law regarding ineffective assistance of counsel claims is
> well settled and well documented. In *Strickland v. Washington*,
> 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the
> Supreme Court set forth a two-part test for analyzing ineffective
> assistance of counsel claims. According to *Strickland*, first, the
> defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that
> counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment. Second, the defendant
> must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so
> serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable. *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

*Strickland* requires proof of both deficient performance and consequent prejudice. *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds."). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.

Mack must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." 466 U.S. at 691. To meet this burden, Mack must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 691. Mack cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful.

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable . . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (*en banc*) (*quoting Burger v. Kemp*, 483 U.S. 776, 794 (1987)). The required extent of counsel's investigation was addressed recently in *Hittson v. GDCP Warden*, 759 F.3d 1210, 1267 (11th Cir. 2014), *cert. denied sub nom., Hittson v. Chatman*, 135 S. Ct. 2126 (2015):

> [W]e have explained that "no absolute duty exists to investigate particular facts or a certain line of defense." *Chandler*, 218 F.3d at 1317. "[C]ounsel has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066 (emphasis added).

> "[C]ounsel need not always investigate before pursuing or not
> pursuing a line of defense. Investigation (even a nonexhaustive,
> preliminary investigation) is not required for counsel reasonably
> to decline to investigate a line of defense thoroughly." *Chandler*,
> 218 F.3d at 1318. "In assessing the reasonableness of an
> attorney's investigation . . . a court must consider not only the
> quantum of evidence already known to counsel, but also
> whether the known evidence would lead a reasonable attorney
> to investigate further." *Wiggins*, 539 U.S. at 527, 123 S.Ct.
> at 2538.

*See also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (confirming that counsel has no duty to raise a frivolous claim).

Under 28 U.S.C. § 2254(d) Mack must prove that the state court's decision was "(1) . . . contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Sustaining a claim of ineffective assistance of counsel is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 106. *See also Pinholster*, 563 U.S. at 202 (An applicant must overcome this "'doubly deferential' standard of *Strickland* and the AEDPA."), *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 911 (11th Cir. 2011) ("Double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding."), and *Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must

view Pooler's ineffective counsel claim — which is governed by the deferential *Strickland* test — through the lens of AEDPA deference, the resulting standard of review is "doubly deferential."), *cert. denied*, 134 S. Ct. 191 (2013).

In denying Mack's motion for post-conviction relief, the state court recognized that *Strickland* governs a claim of ineffective assistance of counsel. (Order Denying Motion for Post-conviction Relief, Respondent's Exhibit 9) Because the state court rejected the claims based on *Strickland*, Mack cannot meet the "contrary to" test in Section 2254(d)(1). Mack instead must show that the state court unreasonably applied *Strickland* or unreasonably determined the facts. In determining "reasonableness," a federal application for the writ of habeas corpus authorizes determining only "whether the state habeas court was objectively reasonable in its *Strickland* inquiry," not an independent assessment of whether counsel's actions were reasonable. *Putnam v. Head*, 268 F.3d 1223, 1244, n.17 (11th Cir. 2001), *cert. denied*, 537 U.S. 870 (2002). The presumption of correctness and the highly deferential standard of review requires that the analysis of each claim begin with the state court's analysis.

**Ground One**

Mack alleges that the trial court erred by not suppressing his confession to the police. Mack claims that mild mental retardation prevented him from understanding his rights when questioned by the police and that the prosecutor failed to establish at

the suppression hearing that Mack voluntarily confessed. The state appellate court rejected this ground in Mack's direct appeal. (Respondent's Exhibits 5 and 7)

The trial court held a suppression hearing at which Detective Sam Levita, Detective William Waldron, Dr. James McGovern, and Mack each testified. The prosecutor introduced into evidence at the hearing a video of Mack's interview at the police station, a *Miranda* waiver form signed by Mack, and a transcript of the police interview. After the hearing the trial judge in a written order (Respondent's Exhibit 2, August 29, 2009) denied the motion to suppress:

> **Finding of Facts**:
>
> . . . .
>
> 3. Detectives Levita and Waldron were assigned the case.
>
> 4. On 24 May 2008 Otis Mack and Marcos Herrara were arrested and brought to the Manatee County Sheriff's office for questioning.
>
> 5. Otis Mack was placed in an interrogation room. The room consisted of one table, one door, no windows and three chairs. A video and audio recording was made of all proceedings that occurred in the interrogation room. Apparently, an audio recording was made of the proceedings which occurred during a smoke break; however, this was not presented at the hearing.
>
> 6. Mr. Mack is in the interview room for approximately five minutes when Detective Levita enters to change Mr. Mack's cuffs from behind his back to the front. Detective Levita then exits the room.
>
> 7. About ten minutes later Detective Levita brings Mr. Mack a soda.
>
> 8. At the 16 minute mark Detective Waldron enters the room to further adjust Mr. Mack's cuffs.

9. At the 20 minute mark Detective Levita enters the room with a leather folder in his hands. The folder has some type of insignia reference the Rays. Mr. Mack comments on same and a sports discussion ensues. In fact, the baseball discussion leads to a debate about which team should win between the Pistons and Detroit. Mr. Mack selects the opposite team.

10. Subsequent to the sports conversation, Detective Levita reads Mr. Mack *Miranda* warnings from a paper. Detective Levita places the *Miranda* form in a position allowing Mr Mack to read along. Mr. Mack appears to read along. At one point Detective Levita asks Mr. Mack if he can read and understand English, to which Mr. Mack responds: "I understand English." Mr. Mack signs that he understands his rights and wishes to waive same.

11. Detective Levita proceeds to ask Mr. Mack questions about his age, who he lives with and family. Mr. Mack responds that he is twenty, lives with his mother and grandmother and that he has lost one sister to a shooting. Mr. Mack also provides his social security number and information about his probation status. While discussing his probation status, Mr. Mack tells Detective Levita he doesn't think he should even be on probation or be required to attend counseling because he did nothing wrong, but that he does to avoid problems with the law. Finally, Mr. Mack provides some background concerning Mr. Herrara coming to live in his home. Mr. Mack appears calm and alert. Mr. Mack is not agitated, stuttering or sweating.

12. At the thirty minute point Detective Waldron enters the room and joins the interview.

13. At this point, Detective Levita asks Mr. Mack what he was doing on 21 May 2008 (Tuesday). Mr. Mack denies leaving his home except for counseling sessions. In addition, Mr. Mack denies knowing anyone in N.W. Bradenton, especially anyone named Janice Fore.

14. At the forty-two minute mark Detective Levita informed Mr. Mack that they are investigating a murder, to which Mr. Mack asks: "What happened?"

15. Detective Waldron informs Mr. Mack that Mr. Herrara has already completed a written statement. In addition, Detective

Levita showed Mr. Mack a copy of the warrant for his arrest with no bond and informs him that his prints were found inside [the victim]'s home. Mr. Mack denies any knowledge of [the victim].

16. Detective Levita left the room at the 48 minute mark but reentered it within a minute and begins to confront Mr. Mack with more evidence. Detective Levita indicates they have obtained: DNA, a video tape showing Mr. Mack with [the victim]'s vehicle and dumped items belonging to [the victim]. Mr. Mack indicates his fingerprints were probably on the duct tape because Mr. Herrara got it from the Mack home.

17. Despite the [d]etectives showing agitation and stating they know he is lying, Mr. Mack denied any knowledge about what could have happened in the Fore home until about the one hour mark.

18. At 1:49:52 minute Mr. Mack is taken for a cigarette break. Mr. Mack is returned to the interview room at 3:50:52. Mr. Mack proceeds to make admissions.

19. Dr. McGovern testified he first met Mr. Mack in 2005,[2] when he was ordered by the court to conduct a competency/sanity evaluation. In 2005, Dr. McGovern opted to administer a secondary intellectual measure to remove any "practice effect" created by the school system['s] constant testing of Mr. Mack.

20. Dr. McGovern again met Mr. Mack in 2006. During this evaluation, Dr. McGovern returned to using the Wechsler Intelligence test. The results obtained from 2005 and 2006 were comparable. Mr. Mack had an overall score of 77, placing him in the borderline range. Dr. McGovern also administered the Medical Sympton Validity Test that indicated Mr. Mack was putting forth satisfactory effort. In addition, Dr. McGovern administered a Street Skills Survival Questionnaire which placed Mr. Mack's overall score at 69 or mentally retarded. Finally, in 2006 Dr. McGovern administered the Gudjonson Suggestibility Scale. Mr. Mack's results indicated he was very susceptible to suggestibility especially in situations where he feels embarrassed or socially inferior. Dr. McGovern also

---

[2] Dr. McGovern evaluated Mack in 2005 and 2006 in a separate unrelated criminal case.

testified that Otis Mack was of sufficient low intelligence that he was at risk for acquiescing in a pressure situation. However, Dr. McGovern also testified the tactics used by the [d]etectives in this case were "non-abrasive" and he had no opinion about whether Mr. Mack had voluntarily waived his *Miranda* [r]ights on 24 May 2008.

21. Otis Mack testified at this hearing in an open courtroom. Present in the courtroom were his two attorneys, the prosecutor, the judge, four uniformed bailiffs and an audience of over forty people. At no time did Mr. Mack appear to be uncomfortable or exhibit problems responding to questions. In fact, on at least one occasion, when the prosecutor was only inches from him referencing the *Miranda* waiver he exhibited no hesitation in asking that a question be repeated. When questioned by his own attorney about each right contemplated by *Miranda*, Mr. Mack accurately described them in turn. In addition, the following exchange took place between Mr. Mack and his attorney:

> Mr. Schaffer: Did you think you had to talk to the because they asked you questions?
>
> Mr. Mack: Yes.
>
> Mr. Schaffer: I mean if the police asked you questions, do you have to answer them?
>
> Mr. Mack: No, sir.
>
> Mr. Schaffer: You don't? Did you have to when you were talking to the police that day?
>
> Mr. Mack: Yes, sir.

**Conclusions of Law**:

A. The Defense argues Mr. Mack's statement should be suppressed because it was not obtained after he voluntarily, knowingly and intelligently waived his *Miranda* [r]ights.

B. Conversely, the State argues they have presented substantial competent evidence that Mr. Mack voluntarily, knowingly and intelligently waived *Miranda*.

C. A Defendant may waive his *Miranda* rights "provided the waiver is made voluntarily, knowingly and intelligently.["] *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). To determine whether a Defendant validly waived his right the State must establish by a preponderance of the evidence that: (1) the relinquishment of the right was voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion or deception, and (2) the waiver must have been done with the full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon. *Moran v. Burbine*, 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135 ( 1986).

D. In conclusion, the *Moran* Court held: Only if the "totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

. . . .

F. In conducting an analysis of the first prong of *Moran*, this Court is aware that "diminished capacity" may be a factor along with improper police conduct in determining voluntariness. *Benitez v. State*, 952 So. 2d 1275 (Fla. 2nd DCA 2007); *State v. Stewart*, 588 So. 2d 1063 (Fla. 3d DCA 1991 ). In the case at bar, this court is unclear as to whether the Defense is arguing that Mr. Mack's borderline intelligence coupled with his results on the Street Skills Survival Questionnaire and Gudjonson Suggestibility Scale is evidence of "diminished capacity;" however, in an abundance of caution this court finds that it is not. In addition, there is no evidence the [d]etectives cajoled, coerced, used trickery or any other underhanded method in presenting the *Miranda* rights to Mr. Mack on 24 May 2008.

G. In conducting an analysis as to the second prong of *Moran*, the court finds that subnormal intelligence[,] though[] a factor[,] it is not the sole factor. Mr. Mack both during the [d]etectives' questioning and in-court testimony was calm and composed.

While acknowledging Dr. McGovern's warnings, this court saw no evidence that Mr. Mack appeared to have no [sic] difficulty answering questions about legal concepts whether they [were] posed by [d]etectives, his own [a]ttorney or the [p]rosecutor despite "social distance" and challenging words. He failed to show any pattern of acquiescing for almost two hours [of] questioning on 24 May 2008; nor did he appear to "fill gaps'" other than to provide possible alibi or plausible explanations as how fingerprint evidence could have been placed on the duct tape. Mr. Mack was twenty years old, and has had experience with the criminal justice system. Specifically, Mr. Mack has been evaluated, had court appointed attorneys and entered a negotiated plea resulting in probation. Mr. Mack's conversation about his previous charges and probation indicates he understands that doing wrong ends with legal punishment. The questioning of Mr. Mack took place at the Manatee Sheriff's office, but was "non-abrasive" and he was provided food, drink and a smoke break. Finally, the [d]etective did obtain a written waiver.

H. Based on an evaluation of the entire videotaped statement; Mr. Mack's in-court testimony, Dr. McGovern's evaluations, warnings and opinions and all the other evidence; the Court finds the State has established by a preponderance of the evidence that Mr. Mack voluntarily, intelligently and knowingly waived *Miranda*.

A two-part inquiry determines whether a defendant has knowingly and voluntarily waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966):

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).

The fact that a defendant suffers from a mental disability is not sufficient, standing alone, to render involuntary a *Miranda* waiver. *See United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995), *cert. denied*, 517 U.S. 1147 (1996). While the defendant's mental capacity is a consideration in determining voluntariness, it is "relevant only in establishing a setting in which actual coercion might have been exerted to overcome the will of the suspect." *Procunier v. Atchley*, 400 U.S. 446, 453–54 (1971). *Colorado v. Connelly*, 479 U.S. 157, 164 (1986), explains:

> The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion. *See United States v. Washington*, 431 U.S. 181, 187, 97 S. Ct. 1814, 1818, 52 L. Ed. 2d 238 (1977); *Miranda*, *supra*, 384 U.S. at 460, 86 S. Ct., at 1620. Indeed, the Fifth Amendment privilege is not concerned "with moral and psychological pressures to confess emanating from sources other than official coercion." *Oregon v. Elstad*, 470 U.S. 298, 305, 105 S. Ct. 1285, 1290, 84 L. Ed. 2d 222 (1985). The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on "free choice" in any broader sense of the word. *See Moran v. Burbine*, 475 U.S., at 421, 106 S. Ct., at 1141 ("[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.... [T]he record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements"); *Fare v. Michael C.*, 442 U.S. 707, 726–727, 99 S. Ct. 2560, 2572–2573, 61 L. Ed. 2d 197 (1979) (The defendant was "not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit.... The officers did not intimidate or threaten respondent in any way. Their questioning was restrained and free from the abuses that so concerned the Court in *Miranda*.").

*See also Moore v. Dugger*, 856 F.2d 129, 132 (11th Cir. 1988) (finding that a mental deficiency, in the absence of police coercion, is not sufficient to establish

involuntariness; the fact that the defendant was generally calm and responsive during the interrogation, that he did not appear confused, and that he understood the questions put to him established a valid waiver of *Miranda* rights, despite the defendant's low IQ); *Dunkins v. Thigpen*, 854 F.2d 394, 399 (11th Cir. 1988) (noting that although "[m]ental illness is a factor to be considered by the trial court when ruling on the validity of a waiver," . . . [m]ental retardation does not by itself prevent a defendant from voluntarily waiving his constitutional rights."). The "essential link" between an involuntary confession and a constitutional violation is police coercion, not mental illness. *Connelly*, 479 U.S. at 165.

Mack presents no evidence of police coercion. Detective Levita testified that, at the time of the police interview, Mack did not appear to have suffered from any mental disease or infirmity that would have prevented Mack from understanding his *Miranda* rights. (Respondent's Exhibit 3A, pp. 8, 19) Dr. James McGovern testified that he could not offer an opinion on whether Mack voluntarily waived his rights in this case. (Respondent's Exhibit 2B, p. 15) During one of his interviews with Mack in a 2005 unrelated criminal case, Dr. McGovern discussed with Mack his *Miranda* rights. Dr. McGovern opined that Mack "adequately understood" *Miranda* at that time. (Respondent's Exhibit 3B, p. 21) Because he did not have any contact with Mack after Mack's arrest for the murder and burglary, Dr. McGovern did not "have any information from [Mack] about the dynamics of his interview with Detectives Levita and Waldron." (Respondent's Exhibit 3B, p. 22) Dr. McGovern did,

however, listen to portions of the recordings of Mack's interview with the detectives and testified that he did not hear the detectives "becoming abrasive at any point." (Respondent's Exhibit 3B, p. 28)

When questioned by the prosecutor at the suppression hearing about the written *Miranda* waiver form, Mack testified both that Detective Levita read to him each of the rights while showing Mack the waiver form and that that was not the first occasion on which a police officer had read those rights to him. (Respondent's Exhibit 3B, pp. 38–39) The prosecutor reviewed with Mack the waiver form Mack executed in his 2005 Bradenton criminal case. (Respondent's Exhibit 3B, pp. 39–41) Mack acknowledged both that he told the Bradenton police that he understood his rights when the *Miranda* form was read to him in the previous case and that he told Detective Levita that he understood those same rights when Detective Levita read the *Miranda* form to him after his arrest for the murder and burglary charges. When asked if he had to answer questions from the police after signing the forms, Mack answered, "[Y]es, sir." (Respondent's Exhibit 3B, p. 48) Detective Levita testified that Mack was provided food and drink and was afforded a smoking break approximately one hour into the interview. (Respondent's Exhibit 3A, pp. 11–13, 23–24)

Mack presents no evidence to rebut the state post-conviction court's conclusion that "there is no evidence the [d]etectives cajoled, used trickery or any other underhanded method in presenting the *Miranda* rights to Mr. Mack." Although

he claims a "lack of understanding as to his rights" and that his "understanding of what was occurring [during the police interview] was clearly at issue," Mack does not specify what right he did not understand. Mack shows neither (1) that the detectives coerced him into executing a *Miranda* waiver, (2) that the detectives observed but ignored any outward sign of a mental defect, or (3) that the detectives exploited any such defect. Accordingly, Mack fails to show that his *Miranda* waiver was involuntary.

Mack also fails to show that his waiver was not knowing or intelligent. "When determining whether a waiver was competently made, courts consider mental health as part of the totality of the circumstances." *United States v. Richardson*, 732 F. App'x 822, 827 (11th Cir. 2018) (citing *Miller v. Dugger*, 838 F.2d 1530, 1539 (11th Cir. 1988)).[3] Mack does not dispute that Detective Levita read to him the written waiver form and that he understood each right included in the waiver. Mack then executed the written waiver form and cooperated with the detectives during the interrogation. According to Detective Levita, Mack at no time exhibited any observable sign that he did not understand the warnings or that he was under the influence of drugs. (Respondent's Exhibit 3A, transcript of August 6, 2009, suppression hearing, pp. 7–8, 18–19) Mack was not a minor at the time of the interview, he did not have trouble understanding English, and he had previous

---

[3] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. Rule 36-2.

experience in the criminal justice system.  Although Dr. McGovern testified that

when he examined Mack in the fall of 2005 and in August of 2006 in a separate

unrelated criminal case — nearly two years before the May 2008 murder — Mack

"was of subnormal intelligence" and susceptible to suggestibility, Dr. McGovern

could not "offer any opinion as to whether or not Otis Mack voluntarily waived his

rights in this particular case."  (Respondent's Exhibit 3B, transcript of August 25,

2009, suppression hearing, p. 15)  Dr. McGovern further testified that during his

earlier evaluation he discussed *Miranda* rights with Mack and that Mack understood

those rights.[4]  Dr. McGovern's assessment neither establishes that Mack was

---

[4] Dr. McGovern testified on cross-examination at the suppression hearing as follows
(Respondent's Exhibit 3B, transcript of August 25, 2009, hearing, pp. 21–22):

> Q: You also discussed with him some of the *Miranda* concepts?
>
> A: I did.
>
> Q: And he was able to recite and explain that one has the right to
> remain silent and that anything they say can be used against them in
> court?
>
> A: My opinion was that, yes, he adequately understood the *Miranda*
> at the time, although I don't believe . . . I can't recall that he actually
> recited it as well as you did.
>
> Q: He understood that the *Miranda* warning advises someone of a
> right to an attorney?
>
> A: Correct.
>
> Q: Now, you did have to explain to him that indigent defendants are
> offered legal services at no charge?
>
> A: Correct.

(continued...)

incapable of knowingly and intelligently waiving his rights nor concludes that Mack did not understand his *Miranda* rights. Mack provides no specific reason for why any alleged intellectual disability rendered his waiver invalid. Consequently, Mack demonstrates neither that he was incapable of understanding the nature of his *Miranda* rights nor that his waiver was not knowing and intelligent. Mack fails to meet his burden of proving that the state court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in rejecting his ground challenging the trial court's denial of his motion to suppress.

**Ground Two**

Mack contends that his trial counsel rendered ineffective assistance by not submitting to the jury evidence of Mack's "mental illness and defect," which allegedly would have shown that Mack lacked the intent to commit burglary. Mack

---

[4](...continued)

> Q: But once you explained this to him, he appeared to understand it
> and he retained that knowledge throughout the session?
>
> A: Yes.
>
> . . . .
>
> Q: In the case currently before the Court in which he's accused of
> felony murder, you did not have any contact with Mr. Mack?
>
> A: Correct.
>
> Q: As a consequence of that, you do not have any information from
> him about the dynamics of his interview with Detectives Levita and
> Waldron?
>
> A: Also correct.

argues that "[t]he evidence of the mental illness was needed to establish the duress theory of defense which would have negated the elements needed to establish the felony murder offense." (Doc. 1, p. 5) The respondent opposes this ground as procedurally defaulted because Mack did not raise the ground in the state court. Mack admits that he did not present this ground to the state court but asserts entitlement to a merits review under *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), because "the state of Florida failed to provide counsel for [his] initial tier post-conviction motion forcing [him] to file *pro se* and inadvertently omit this substantial claim." (Doc. 1, p. 10) The respondent contends (1) that *Martinez* does not apply and (2) even if *Martinez* applies, Mack is not entitled to relief because the ground of ineffective assistance of trial counsel is not "substantial." As a result, the respondent claims that Mack's failure to overcome the procedural default precludes federal review.

An applicant must present each claim to a state court before raising the claim in federal court. "[E]xhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995), *Picard v. Connor*, 404 U.S. 270, 275 (1971). *Accord Rose v. Lundy*, 455 U.S. 509, 518–19 (1982) ("A rigorously enforced total exhaustion rule will encourage state prisoners to seek full relief first from the state courts, thus giving those courts the first opportunity to review all claims of constitutional error."),

and *Upshaw v. Singletary*, 70 F.3d 576, 578 (11th Cir. 1995) ("[T]he applicant must have fairly apprised the highest court of his state with the appropriate jurisdiction of the federal rights which allegedly were violated.").

Mack did not present his ground of ineffective assistance of trial counsel to the state court in his Rule 3.850 motion. Consequently, the ground is unexhausted. State procedural rules preclude Mack from returning to state court to present the ground in a second Rule 3.850, rendering the ground procedurally defaulted. Fla. R. Crim. P. 3.850(k).

"If the [applicant] has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). To establish cause for a procedural default, an applicant "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). To show prejudice, an applicant must demonstrate not only that an error at the trial created the possibility of prejudice but that the error worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimension. *United States v. Frady*, 456 U.S. 152 (1982). In other words, an applicant must show at least a reasonable probability of a different outcome. *Henderson*, 353 F.3d at 892.

Mack argues that he is entitled to a merits review of his ground of ineffective assistance of trial counsel under *Martinez* and *Trevino* because the state post-conviction court failed to appoint him counsel in his Rule 3.850 post-conviction proceedings. *Martinez* holds that "inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial," a holding that creates a narrow equitable exception to *Coleman v. Thompson*, 501 U.S. 722 (1991).[5] *Trevino*, 569 U.S. at 417, extends *Martinez* to a case in which a state law technically permits a defendant to raise on direct appeal an ineffective assistance of counsel claim but "[t]he structure and design of the [state] system in actual operation . . . make[s] it 'virtually impossible' for an ineffective assistance claim to be presented on direct review." *Martinez* applies in the limited circumstance when (1) a state requires a prisoner to raise a claim of ineffective assistance of trial counsel in an initial-review collateral proceeding, (2) the prisoner failed properly to raise the ineffective assistance of counsel claim in his state initial-review collateral proceeding, (3) the prisoner did not have collateral counsel or his counsel was ineffective,[6] and (4) failing to excuse the procedural default would result in the loss of a "substantial" claim of ineffective

---

[5] *Coleman,* 501 U.S. at 753–54, holds that an attorney's error in a post-conviction proceeding does not qualify as cause to overcome a default.

[6] *Trevino,* 133 S. Ct. at 1917, 1921, repeats the cause and prejudice standard explained in *Martinez* by stating that a "prisoner may obtain federal habeas review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law" so long as "there was no counsel or counsel was ineffective" in the initial-review collateral proceeding.

assistance of trial counsel. A "substantial" claim is a claim that has "some merit." *Martinez*, 566 U.S. at 17.

Mack fails to show that his ground of ineffective assistance of trial counsel is "substantial." The record confirms that counsel strategically chose to not call Dr. McGovern to testify at trial about Mack's mental defects.[7] "The inquiry into whether a lawyer has provided effective assistance is an objective one: a[n] [applicant] must establish that no objectively competent lawyer would have taken the action that his lawyer did take." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002). A habeas applicant must overcome a presumption that counsel's challenged

---

[7] Counsel advised the trial judge of his decision not to call Dr. McGovern (Respondent's Exhibit 9B, p. 882):

> THE COURT: My understanding is you're not putting on Dr. McGovern?
>
> [COUNSEL]: No, we are not.
>
> THE COURT: So I'm going to do an inquiry of both those issues, so if you want to prepare and talk to Mr. Mack about the fact that you're not putting Dr. McGovern on.
>
> [COUNSEL]: That[,] I believe[,] is a tactical question and I made that decision.
>
> THE COURT: I understand, it still has to be his decision. I also have to know he's comfortable with that decision, so if you would please talk to him about that, so I know that discussion has taken place. If you refuse to, that's fine, I'll ask him about that . . . .
>
> [COUNSEL]: Judge, I think it's fairly clear that that's a tactical decision that is up to me. And I've made that decision.

Mack confirmed that he had discussed the "strategy decision" with counsel and understood that Dr. McGovern would not testify. (Respondent's Exhibit 9B, p. 886)

conduct was a matter of strategy. *Strickland*, 466 U.S. at 689; *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). Mack cannot meet his burden of satisfying *Strickland's* requirements merely by showing that the avenue chosen by counsel proved unsuccessful. *See e.g., Minton v. Sec'y, Dep't of Corr.*, 271 F. App'x 916, 918 (11th Cir. 2008) ("The Supreme Court has 'declined to articulate specific guidelines for appropriate attorney conduct and instead has emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'") (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)), and *Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) ("Even if counsel's decision appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'") (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983)). A defendant's disagreement with counsel's tactics or strategy will not support a claim of ineffective assistance of counsel. *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (*en banc*) ("[W]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision."); *Chandler*, 218 F.3d at 1314 (finding that counsel is not incompetent for performing in a particular way in a case as long as the approach taken "might be considered sound trial strategy").

Mack fails to show that trial counsel's strategic decision to not introduce evidence of Mack's mental defects was patently unreasonable. *See Dingle*, 480 F.3d at 1099. Diminished mental capacity is inadmissible to disprove the specific intent or

state of mind required for proof of a criminal offense. *Nelson v. State*, 43 So. 3d 20, 30 (Fla. 2010) ("Our precedent has firmly established the inadmissibility of evidence relating to mental capacity absent an insanity plea."); *Chestnut v. State*, 538 So. 2d 820 (Fla. 1989) (holding that "that evidence of abnormal mental condition not constituting legal insanity is inadmissible for purposes of proving either that [the] accused could not or did not entertain the specific intent or state or mind essential to proof of the offense, in order to determine whether [the] crime charged, or lesser degree thereof, was in fact committed."). Because evidence of diminished mental capacity is inadmissible to disprove specific intent or state of mind, Mack cannot show that counsel's decision to not present evidence of Mack's alleged mental deficiency resulted in prejudice. Absent a showing of prejudice, *Strickland's* requirements remain unsatisfied. Consequently, Mack cannot benefit from the *Martinez* exception to overcome the default of his ground of ineffective assistance of counsel because the ground is not "substantial." *See Hittson*, 759 F.3d at 1271 ("Because Hittson has not alleged any facts to warrant a finding of *Strickland* prejudice, his . . . claim is not 'substantial.'").

Absent a showing of cause and prejudice, an applicant may obtain federal habeas review of a procedurally defaulted claim only if review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 495 96 (1986). A fundamental miscarriage of justice occurs if a constitutional violation has probably resulted in the conviction of someone

who is "actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001). To meet the "fundamental miscarriage of justice" exception, Mack must show constitutional error coupled with "new reliable evidence — whether . . . exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup*, 513 U.S. at 324.

Mack cannot meet the "fundamental miscarriage of justice" exception because he presents no "new reliable evidence" that he is actually innocent. *Schlup*, 513 U.S. at 327. Because Mack satisfies neither the cause and prejudice exception nor the fundamental miscarriage of justice exception to procedural default, ground two is procedurally barred from federal review.

**Ground Three**

Mack contends that the trial court violated his constitutional rights to a fair trial and due process by denying his motion for judgment of acquittal on the burglary charge. He argues that the prosecutor "only made a showing that [Mack] accompanied his co-defendant into the dwelling" and failed to prove that Mack intended "to enter the dwelling and commit a crime therein." (Doc. 1, p. 8)

Mack admits in the federal application that he did not exhaust this ground in the state court because "[c]ounsel on [d]irect appeal did not raise the issue." (Doc. 1, p. 8) State procedural rules preclude Mack from returning to state court to present his federal ground in a second direct appeal. Mack's failure to properly exhaust his

federal ground in the state court results in a procedural default. To the extent that Mack alleges the ineffective assistance of his appellate counsel caused the default of his trial court error claim, he cannot overcome the default because he did not exhaust the ineffective assistance of appellate counsel claim in his state habeas petition. (Respondent's Exhibit 17) *See Butts v. GDCP Warden*, 850 F.3d 1201, 1214–15 (11th Cir. 2017) ("An ineffective assistance of appellate counsel claim may, "if both exhausted and not procedurally defaulted, . . . constitute cause" to excuse procedural default."). *See also Edwards v. Carpenter*, 529 U.S. 446, 450–51 (2000) (concluding that a federal habeas court is barred from considering a procedurally defaulted ineffective assistance of counsel claim as cause for procedural default of another claim); *Hill v. Jones*, 81 F.3d 1015, 1029-31 (11th Cir. 1996) (noting that the Supreme Court's jurisprudence on procedural default dictates that a procedurally defaulted claim of ineffective assistance of counsel cannot serve as cause to excuse the default of a second claim of ineffective assistance of counsel). Consequently, any alleged ineffective assistance by appellate counsel cannot serve as cause to overcome the default of Mack's ground of trial court error.

Mack likewise cannot benefit from *Martinez* because *Martinez* is limited to an attorney's error in initial review collateral proceedings. 566 U.S. at 16. *See Lambrix v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1246, 1260 (11th Cir. 2014) ("Importantly, the *Martinez* rule is expressly limited to attorney errors in initial-review collateral proceedings."); *Gore v. Crews*, 720 F.3d 811, 816 (11th Cir. 2013) ("By its own

emphatic terms, the Supreme Court's decision in *Martinez* is limited to claims of ineffective assistance of trial counsel that are otherwise procedurally barred due to the ineffective assistance of post-conviction counsel."). The ineffective assistance of appellate counsel provides no cause for Mack's failure to exhaust his ground of trial court error. Accordingly, Mack fails to establish cause and prejudice to overcome the procedural default of ground three.

Mack cannot meet the "fundamental miscarriage of justice" exception because he presents no "new reliable evidence" that he is actually innocent. *Schlup*, 513 U.S. at 327. Because Mack satisfies neither exception to procedural default, ground three is procedurally barred from federal review.

Accordingly, Mack's application for the writ of habeas corpus (Doc. 1) is **DENIED**. The clerk must enter a judgment against Mack and close this case.

### DENIAL OF BOTH A
### CERTIFICATE OF APPEALABILITY
### AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Mack is not entitled to a certificate of appealability ("COA"). A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his application. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a COA. Section 2253(c)(2) permits issuing a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." To merit a COA, Mack must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise. *See* 28 U.S.C.

§ 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001). Because he fails to show that reasonable jurists would debate either the merits of the claims or the procedural issues, Mack is entitled to neither a certificate of appealability nor an appeal *in forma pauperis*.

Accordingly, a certificate of appealability is **DENIED**. Leave to appeal *in forma pauperis* is **DENIED**. Mack must obtain permission from the circuit court to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on March 8, 2019.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE